# UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v ) | INDICTMENT #: 4:12CR18 |
| ) | |
| ELIJAH AKEEN SAMPSON, ) | |
|     Defendant ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW the Defendant ELIJAH AKEEN SAMPSON, by and through his attorney of record who submits this Sentencing Memorandum in support of his request for a sentence of not more than ONE HUNDRED EIGHTY (180) months confinement; followed by a period of not more than three (3) years of supervised release. The sentence requested is "sufficient but not greater than necessary" to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

The guideline range recommended by the Probation Officer (Paragraph 62, PSR) is based upon a total offense level of 30 and a criminal history category of IV which results in a guideline range for confinement of 262 to 327 months ( which is essentially 22 to 27 years).

## FACTUAL BACKGROUND

The Defendant Elijah Sampson is a 23 year old black male who has a sixth grade education. Sampson's first arrest came at the early age of 17 when on September 1, 2006 he was arrested and charged with obstruction of a Law Enforcement Officer. The case was sent to the State Court of Chatham County under case number R07010058. The case was dismissed on June 10, 2008. It appears from the Chatham County

1

Courthouse records that the Defendant was enrolled in some type of Early Intervention Program because the file notes that he "successfully completed probation requirements" after which time the case was nolle prossed by the District Attorney's Office. According to the Probation Officer's report the offense stemmed from an arrest when the Defendant attempted to flee on foot from a Police Officer. (PSR, ¶ 48,p2)

In January of 2007 the Defendant was arrested for theft by receiving stolen property however there was apparently no disposition and his Probation Officer noted that "additional information regarding this arrest is not available". (PSR, ¶ 49, p 2)

Unfortunately at the age of 20, with only a sixth grade education and little or no parental guidance, the Defendant began to be involved in drug activity. He was arrested on June 14, 2009 at the age of 20. He was charged with possession of marijuana with intent to distribute and obstruction. That case was indicted under case number CR10-0059-BR. On March 28, 2010 the Defendant entered a negotiated guilty plea and was sentenced to five years of probation and 40 hours of community service. The Probation Officer's report notes that the arrest involved possession of five small bags of marijuana and the modest sum of $86.00 was found in the possession of the Defendant. It is to be noted that while the Defendant was out on bond on this case he was arrested again on July 26th with similar charges, possession with intent to distribute and possession of marijuana. The plea that he entered on March 8, 2010 in the Superior Court of Chatham County encompassed the new charges as well as the charges from the arrest of June 14, 2009. (PSR, ¶ 41, p 10 & PSR, ¶ 42, p 11)

The Probation Officer's report indicates that the Defendant was "smoking a marijuana cigarette at the time of his arrest and was found to be in the possession of a small quantity of marijuana and $282." (PSR, ¶ 42, p 11)

The Defendant's sentences in these two Superior Court matters expire in December 2014 and March 2015. The Defendant was given credit for time served which accounts for the disparity in the sentence. (PSR, ¶ 41, p 10 & PSR, ¶ 42, p 11)

On April 1, 2010 the Defendant was arrested for carrying a concealed weapon and carrying a pistol without a permit. He was indicted under case number CR10-1887 and was convicted on August 13, 2010. He was sentenced to twelve months in prison and, with credit for time served from the date of his arrest (April 1, 2010), he was released on March 7, 2011.

Sometime during the summer of 2011 the Defendant met what turned out to be a "confidential reliable informant" who was operating a convenience store in the vicinity of West DeRenne Avenue, close to where the Defendant lived. After conversations with the informant about drug transactions the Defendant was referred to a drug purchaser who in reality was an undercover agent of the Bureau of Alcohol, Tobacco, Firearms & Explosives. According to the case report and the Probation Officer's statement, the informant negotiated for the purchase of a quantity of cocaine from the Defendant and then arranged to have the Defendant deliver the cocaine to the ATF Agent at his location in Thunderbolt.

On June 22, 2011 the Defendant went to the Thunderbolt warehouse and sold a quantity of cocaine to the ATF Agent for $600.00. A review of the video will show that the Agent and the Defendant were engaged in banter and on the first transaction the only thing discussed was the sale of the cocaine. The weight of the cocaine was 13.75 grams according to the PSR. (PSR, ¶ 5-6, p 3-4)

On July 19, 2011 the Defendant went back to the undercover location and conducted another sale. The Defendant sold 13.12 grams of cocaine for $600.00. (PSR, ¶ 6, p 4)

A third sale was conducted on August 24, 2011 at the Thunderbolt location and the sale involved a quantity of Ecstasy tablets; however apparently the suspected Ecstasy tablets may have been counterfeit, as there is no lab results report. (PSR, ¶ 7, p 4)

On August 25, 2011 the Defendant conducted his fourth drug sale with the ATF Agent. He sold a quantity of cocaine (12.79 grams) to the Agent for $500.00. (PSR, ¶ 8, p 4)

According to the Presentence Report and as reported by the case agent's report **the Defendant was solicited by the ATF Agent with regard to the purchase of handguns**. The Agent advised the Defendant that he was interested in purchasing the handguns to be sent to New York. This is the first mention of handguns and the conversation was initiated by the ATF Agent. (PSR, ¶ 8, p 4)

At this point, August 25, 2011 the Agents had probable cause to arrest the Defendant for any one of the four prior sales; that is the sales made on June 22, 2011; July 19, 2011; August 24, 2011 and August 25, 2011.

Rather than arrest the Defendant however the Agents persisted in creating a relationship with him causing the Defendant to place trust in the Agents and causing him to discuss with them the possibility of engaging in gun sales.

Prior to August 31, 2011 the Defendant contacted the ATG Agent and advised him that he had a friend who had a gun to sell. According to the PSR Sampson told the agent that his friend "Red" had a rifle to sell and that he had a pistol. At the meeting of August 31, 2011 **the Defendant did not have a weapon** however his friend brought and sold to the agents a 22 caliber rifle for which the ATF Agent paid $180.00. (PSR, ¶ 9, p 4)

On September 22, 2011 the Defendant engaged in another sale of cocaine to the Agents and received $1,000.00 for the sale of 27.79 grams. The Agent had agreed to pay an additional $125.00 at a later date. (PSR, ¶ 10, p 4-5)

4

On September 28 2011 the Defendant contacted the Agent and once again offered to sell a quantity of cocaine. On that date the Defendant sold 13.59 grams for a total of $600.00. (PSR, ¶ 11, p 5)

**At this point the Agents had a total of SIX drug sales for which they could have arrested the Defendant; however they chose to continue to "build trust" so as to lead the Defendant down the "Federal Prison Highway" toward an illegal sale of guns and thereby get him designated as a career offender as defined by §4B1.1 of the Sentencing Guidelines.**

On October 26, 2011, after **several government "encouragements**" (the very definition of sentence entrapment) the Defendant offered, for the first time to sell, a handgun to the Agent. The offer was made in conjunction with an offer to sell cocaine. After some discussion the Defendant produced a Cobra Enterprises, .380 caliber semi-automatic pistol and offered to sell the firearm for $450.00. He also sold 14.19 grams of cocaine on the same date. (PSR, ¶ 12, p 5)

On November 10, 2011 the Defendant sold a Taurus .38 caliber revolver for $450.00. This sale was not made in conjunction with a drug sale. (PSR, ¶ 13, p5-6)

On November 16, 2011 the Defendant returned again to the undercover location and sold 14.27 grams of cocaine for $1,600.00. He also sold the Agent a .38 caliber Smith & Wesson for $400.00. (PSR, ¶ 14, p 6)

` On December 19, 2011 the Defendant returned yet again to the undercover location and sold 13.65 grams for $500.00 and he also sold a Taurus .25 caliber semi-automatic pistol for $500.00. (PSR, ¶ 15, p 6) **This was the third sale orchestrated by the undercover Agents. It was not to be the last.**

5

On January 25, 2012 the Defendant went to the Thunderbolt location. He produced a quantity of cocaine which turned out to be 14.15 grams and also inquired as to whether or not the Agents were interested in purchasing an AK47. **However, there was no gun sale on January 25, 2012.**

Rather than arrest the Defendant even though the Agents had more than enough probable cause they continued to lure him down this path and on February 22, 2012 the Defendant one last time went to the undercover location and was arrested. At the time of his arrest he was in possession of approximately 13 grams of powder cocaine. (PSR, ¶ 7, p 7)

According to the PSR the Defendant distributed or possessed with the intent to distribute a total of 137.17 grams of cocaine hydrochloride; 13.12 grams of cocaine base; and 14 Ecstasy tabs during the period of June 22, 2011 through February 22, 2012, or over a total of 8 months. During approximately the same time period, from August 31, 2011 through December 19, 2011 the Agents were able to induce the Defendant to sell them a total of 5 weapons. (PSR, ¶ 18 & 19, p 7)

It is to be noted that in paragraph 20 of the PSR the Probation Officer has correctly stated there were **"no identifiable victims in this offense."** I would suggest that one of the victims would be the Defendant himself by virtue of the actions of the ATF Agents.

As a result of the foregoing activities, the Defendant was indicted in a 19 count indictment charging him with a violation of 21 USC § 841(a)(1); 18 USC § 922(a)(1); 18 USC § 924(c); 18 USC § 922(g)(1); and 18 USC § 922(k).

## **THE PLEA AGREEMENT**

After review of the evidence with the Defendant, the Defendant agreed to enter a plea to counts 17 and 18 of the indictment. Pursuant to the plea agreement counts 1

through 16 and count 19 were to be dismissed, but of course the Court is aware of the concept of relevant conduct. The concept was explained to the Defendant however the import of the relevant conduct may not have been fully understood due to the Defendant's lack of education.

Prior to the PSR there was no mention, notice or disclosure of the fact that, in addition to or perhaps because of the "stacking of the offenses" by the case agents, Defendant would be treated as a "career offender".

## ARGUMENT

In 2003 Daniel L. Abelson published an article in the Marquette Law Review entitled **Sentencing Entrapment: An Overview and Analysis**. (Marq. L. Rev., Volume 86, Page 774 et seq.) In his introduction Abelson gives three illustrations of what he describes of the "terrifying capacity for escalation of a Defendant's sentence based upon an investigating officer's determination." (Abelson lifted the quote from ***United States v. Shepherd***, 857 F. Supp. 105, 108, a 1994 Decision from the District of Columbia District Court; the case was later vacated at 102 F. 3d 553).

The three examples used to illustrate this feature of the US Sentencing Guidelines included one which was very similar to the Sampson case. That example involved a situation in which "over the course of five weeks, a Defendant sold crack seven times to an undercover officer. At the sentencing hearing it was determined that the Defendant had sold a total of 50.4 grams of crack to the officer and as a result the sentence resulted in a mandatory minimum penalty of ten years. There was evidence that the officer continued to do business until over 50 grams of crack cocaine were involved because the officer knew that the sale of over 50 grams would double the Defendant's sentence." (Mar. L. Rev. 86: 773, 774)

This sentencing entrapment case was ***US v Barth*** (990 F2d 422, 1993) a decision from the Eighth Circuit in which the Court of Appeals recognized the doctrine of

sentence entrapment as a concept but did not find that it had factually occurred in the *__Barth__* case. The Appellate then reversed the Trial Court's judgment, which had granted a downward departure and remanded the case for resentencing. The *__Barth__* Court noted that "(a)lthough courts have not generally adopted the concept of sentencing entrapment, the sentencing guidelines are causing courts nationwide to rethink the long-established rule of entrapment. See, e.g., United States v. Williams, 954 F.2d 668, 673 (11th Cir.1992)"

As this Court knows the Sentencing Commission views downward departures "as a dangerous necessity whose scope and significance needs to be narrowly conceived and greatly confined. Before enactment of the guidelines, Federal Judges had almost unfettered discretion in imposing sentences however this discretion was generally not reviewable on appeal. This in turn led to a great disparity in sentences which resulted in the establishment of the US Sentencing Commission and adoption of the US Sentencing Guidelines.

Today downward departures are relatively rare, although the number of such departures varies greatly by Circuit as noted by Douglas A. Berman, **Balanced and Purposeful Departures: Fixing a Juris Prudence that Undermines the Federal Sentencing Guideline**s, 76 Notre Dame L. Rev. 21, 25; 2000. In fact in Berman's article he cited the 1998 departure rate and showed that the 11th Circuit has one of the lowest rates of downward departures in the entire country.

As in the drug case used by way of illustration, in the Sampson case the Defendant "undoubtedly committed the crime, but law enforcement has arguably acted to increase the Defendant's penalty". As criticized by Abelson, "Situations like these have engendered the doctrine of sentencing entrapment, also known as sentencing manipulation." (Marq. L. Rev. 86: 773, 774)

18 U.S.C. § 3553(b) states that "the Court shall impose a sentence of the kind, and within the range, referred to in subsection (a) (4) unless the Court finds that there

exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines this should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the Court shall consider only the sentencing guidelines, policy statements and official commentary of the Sentencing Commission. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a) (2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission."

Section 3553(b) clearly implies that a Court cannot consider extrinsic factors in departing from the Guidelines. Sentencing entrapment and manipulation are not common grounds for downward departures; however, some Courts have used the application notes in Section 2D1.1 as a statutory basis for a downward departure based on sentencing entrapment. (See ***United States v. Searcy***, 233 F. 3d 1096, 1099; 8th Cir. 2000)

Abelson discusses entrapment and writes that "sentencing entrapment may be characterized as an outgrowth of the affirmative defense of entrapment. The salient distinction between sentencing entrapment and entrapment is that entrapment is a defense to a crime, while sentencing entrapment merely lowers a Defendant's sentence. Many of the same policies support both concepts. The Federal system applies a subjective approach to entrapment. 'A valid entrapment defense has two related elements: Government inducement of the crime, and a lack of predisposition on the part of the Defendant to engage in this criminal conduct.' However, the focus is on whether the Defendant had the requisite intent to commit the crime. Entrapment is a 'relatively limited defense' predicated on 'the notion that Congress could not have

intended criminal punishment for a Defendant who has committed all of the elements of the proscribed offense, but was induced to commit them by the Government.' "

Profession Abelson goes on to state that 'to determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." (Marq. L. Rev. 86: 773, 779; Citations omitted)

Abelson finds the distinction between entrapment and sentencing entrapment by relying upon "the degree of intent". He says that "a Defendant who raises a defense of entrapment is arguing that he did not have the requisite intent to commit the crime at all; in contrast, a Defendant who argues sentencing entrapment is asserting only that he did not have the intent to commit that serious of a crime." (id. 780)

Black's Law Dictionary defines sentencing entrapment as "entrapment of a Defendant who is predisposed to commit a lesser offense but who is unlawfully induced to commit a more serious offense that carries a more severe sentence."

According to Abelson the 11th Circuit has rejected sentencing entrapment as a matter of law because in the Court's analysis the guidelines do not authorize such a departure. Abelson cited **_United States v. Miller_**, 71 F. 3d 813, 817-18; a 1996 Decision. Abelson noted that the 11th Circuit considers sentencing manipulation and sentencing entrapment as distinct doctrines and he indicated that the 11th Circuit has left open the possibility that sentencing manipulation may be a valid argument to raise at a sentencing hearing.(citing **_United States v. Govan_**, 293 F. 3d 1248, 1251; 2002).

In **_Govan_**, the 11th Circuit Court (2002), declared that "If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct…the Court may consider imposing a sentence departing from the otherwise applicable guideline range…even if the defendant is a career offender…"

The Court went on to address the sentencing manipulation issue by saying "Sentencing factor manipulation focuses on the government's conduct. It requires us to consider whether the manipulation inherent in a sting operation, even if insufficiently oppressive to support an entrapment defense…or due process claim…must sometimes be filtered out of the sentencing calculus." (citing **_US v Sanchez_**, 138 F3d 1410, 1414 {11th Cir.1998})

In **_Sanchez_** the Court noted that the issue of whether sentencing manipulation may be a valid basis for a downward departure had not yet been specifically addressed by the 11th Circuit. The **_Sanchez_** Court note that no other Federal Appellate Court had ordered a downward departure on the basis of sentence manipulation. The 11th Circuit in **_Sanchez_** declared that "even assuming sentencing manipulation was a valid basis for a downward departure, the Defendant was not entitled to a departure because of the fact that the Government's fictitious reverse sting operation involved a large quantity of drugs, instead of a smaller one which would have sufficed for conviction purposes (and therefore) did not amount to the type of manipulative Government conduct that might warrant a downward departure in sentencing."

In the Sampson case, after FIVE MONTHS' of transactions, the Government's agents finally induced the Defendant to sell a gun. **This sale and the subsequent sales resulted in the Defendant being manipulated into the Career Offender category.**

In the **_Govan_** (293 F. 3d 1248, 1251; 2002) the District Court had found that there was in fact sentence manipulation because the Government had aggregated separate quantities of crack cocaine by buying smaller quantities on four separate occasions. The agents conduct in **_Govan_** is similar to the conduct, both as to the drugs and the guns in the Sampson case. The Court of Appeals pointed out that the agents in Govan (as in Sampson) could have stopped and arrested the Defendant after the first buy but continued to make purchases until the accumulation of drugs reached the quantity for sentence enhancement.

However, the ***Govan*** decision stated that making four purchases instead of one was no more manipulative than the Government setting in motion a fictitious sting operation to purchase a larger quantity.

The distinctions in ***Govan*** and ***Sanchez*** from the case at bar are important. In the Sampson case the agents made not one, not four or five but a total of 11 purchases of drugs and five purchases of firearms **over a period of eight months**. They also changed the nature of the transactions from drug sales to gun sales. These circumstances are clearly distinguishable in fact and in principle from those in both ***Govan*** and ***Sanchez***.

The agents' conduct in Sampson is clearly indicative of manipulation of an uneducated, unsophisticated defendant in such a manner as to greatly increase his sentence range.

In March 2012 the New York University School of Law's Public Law and Legal Theory Research Paper Series released a paper written by Eda Katharine Tinto entitled ***Undercover Policing, Overstated Culpability***. The article will appear in the Cardozo Law Review, Volume 34 to be published in 2013.

In the article the author describes the legal doctrine of sentencing manipulation as addressing "the tactics used by undercover officers and their effects on the Defendant's sentence. The sentencing manipulation claim, and the related claim of sentencing entrapment, is focused not on whether the Defendant is legally guilty of the underlying conduct but rather on the extent to which the Defendant should be sentenced on the basis of conduct that he alleges was improperly suggested by the police." (34 CARDOZO LAW REVIEW ___ (forthcoming 2013) at p1)

The article notes that "most critically, the doctrine of sentencing manipulation raises a fundamental underlying question whether Defendant is fully culpable for all of the criminal conduct committed with the participation of the undercover officer."

The Tinto article noted that "it is a longstanding tenet of sentencing that 'the punishment should fit the offender and not merely the crime'" (citing **Pepper v. United States**, 131 S. Ct. 1229, 1240; 2011)

For the determination of sentences justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender. (**Penn. ex rel Sullivan v. Ashe**, 302 U.S. 51, 55; 1937)

There are two very important reasons for the Court to be concerned about sentence manipulation. First, in the context of undercover policing cases, the question of State and Federal mandatory sentencing schemes has essentially shifted some of the sentencing discretion to the police and their agents. As one Court noted, "a judicial function has effectively slipped, at least in some cases, not only to the realm of the prosecution but even further to that of the police." (**U.S. v. Sheppard**, 857 F. Supp. 105, 106; 1994)

Sentencing at the hands of law enforcement runs counter to the traditional placement with the Judge, a placement still valued by the U.S. Supreme Court and Congress even in today's age of determinate and mandatory sentencing.

An acceptable and uniform sentencing manipulation doctrine would enable judicial sentencing discretion when appropriate – that is, it would give Judges the discretion to reduce a Defendant's sentence where that sentence was improperly manipulated by the police. (**Pepper v. United States**, 570 F. 3d 958; 2002)

"With the advent of the Federal Sentencing Guidelines in 1987, and the rise in statutory mandatory minimums in state and federal law throughout the 1980s and 90s, judicial sentencing discretion became increasingly constrained. Judges were required to sentence defendants to mandatory prison terms based on the type of offense and to increase the length of a sentence based on various aspects of the underlying conduct and the defendant's criminal history. Criminal sentencing moved from the ambit of unstructured discretion to a structured and mandatory calculation based on the particulars of the crime, such as the quantity of drugs, the existence of firearms, or the role of the defendant in the crime. (*See* **_Mistretta_**, 488 U.S. at 367–68 (stating that Sentencing Reform Act was "meant to establish a range of determinate sentences for categories of offense and defendants according to various specified factors"); USSG § 2D1.1(c) (establishing base sentencing levels depending on the quantity of drugs); USSG § 2D1.1 (b)(1) (increasing sentence length if firearm was possessed); USSG § 3B1.1–1.2 (adjusting sentence based on role of defendant). This approach to sentencing, while well-recognized as reducing judicial discretion and increasing the impact of prosecutorial discretion in charging decisions, significantly changed the import of law enforcement discretion as well, particularly in the world of undercover policing."

The creation of mandatory sentencing laws placed enormous additional power in the hands of the police—namely, the opportunity to make strategic decisions during an undercover operation that would, in many cases, mandate and dramatically increase a suspect's ultimate sentence. For example, if a defendant bought a handgun and narcotics from an undercover officer, the defendant would potentially face a mandatory minimum sentence of five years, whereas if the police specifically provided a machine gun, the judge would then be required by law to sentence the defendant to an additional twenty-five years in prison. Thus, the actions of undercover officers now have the potential to directly limit much of the remaining judicial sentencing discretion.

Once the impact of police tactical choices due to mandatory minimum sentencing laws becomes evident, as it is in this case, "even if insufficiently oppressive to support an entrapment defense or due process claim", the agents' actions should be factored in

so as to warrant a reduction in the sentence of a defendant (see **_United States v. Connell_**, 960 F.2d 191, 194 (1st Cir. 1992).

In **_United States v. Haile_,** (685 F.3d 1211, decided June 29, 2012) the Eleventh Circuit Court of Appeals confirmed recognition of sentence manipulation writing that "sentencing factor manipulation occurs when the government's manipulation of a sting operation, even if insufficient to support a due process claim, requires that the manipulation be filtered out of the sentencing calculus." **_Ciszkowski,_** 492 F.3d at 1270. "[T]o bring sting operations within the ambit of sentencing factor manipulation, the government must engage in extraordinary misconduct." _Id._ at 1271. If successful, a sentencing factor manipulation argument "would simply reduce the sentence applied to the defendant's misconduct." _Id._ at 1270.

## **CONCLUSION**

It is respectfully submitted that the agents' conduct is this case was so grossly manipulative as to constitute grounds for a down departure after this Court has filters out the manipulation in its calculation of the sentence.

Respectfully Submitted this 18th day of October 2012.

                                        PHILLIPS & ROBERTS

                                        s/ *Bobby Phillips*

                                        BOBBY PHILLIPS, 576700
                                        Attorney for Defendant

402 E. Liberty Street
Savannah, Georgia 31401
(912) 232-0081
Fax 812-232-9079
*email bplaw@msn.com*

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v ) | INDICTMENT #: 4:12CR18 |
| ) | |
| ELIJAH AKEEN SAMPSON, ) | |
| Defendant ) | |

### CERTIFICATE OF SERVICE

This is to certify that I have on this day served all parties in this case in accordance with the Notice of Electronic Filing ("NEF") which was generated as a result of electronic filing in this Court.

This the 18th day of October 2012.

PHILLIPS & ROBERTS

s/ *Bobby Phillips*

BOBBY PHILLIPS, 576700
Attorney for Defendant

402 E. Liberty Street
Savannah, Georgia 31401
912-232-0081
Fax 912-232-9070
**email bplaw@msn.com**