IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

UNITED STATES OF AMERICA          *

v.                                *    CASE NUMBER CR412-18

ELIJAH AKEEN SAMPSON              *

_____

Transcript of Sentencing Hearing held November 2, 2012 before The

HONORABLE WILLIAM T. MOORE, JR., Judge Presiding, reported by

Marie Cowart, Official Court Reporter.

_____

APPEARANCES:

For the Government                        CAMERON H. IPPOLITO, AUSA

For the Defendant                         ROBERT PHILLIPS, III

*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in*

*conjunction with transcription of back−up recording.*

## I N D E X

PRELIMINARIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

FINDINGS OF FACT AND CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . .  3

### Defense Witness

BRIAN MOORE

      Direct Examination by Mr. Phillips  . . . . . . . . . . . . . . . . . . . . . . . . . .  6

      Cross-Examination by Ms. Ippolito . . . . . . . . . . . . . . . . . . . . . . . . . . 19

FURTHER FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

PRONOUNCEMENT OF SENTENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

-3-

1    [NOTE: Court is opened.]

2    THE COURT: Good afternoon, ladies and gentlemen.  Would

3    you call the case, please.

4    CLERK: Yes, Your Honor.  The Court calls the case of United

5    States of America versus Elijah Sampson, Case Number CR412-18.

6    Representing the government is Cameron Ippolito; representing the

7    defendant is Robert Phillips, III.  This case is called for sentencing.

8    MS. IPPOLITO: Your Honor, good afternoon.  The government

9    is ready.

10    MR. PHILLIPS: We're ready to proceed, too, Judge.

11    THE COURT: Well, I thought I picked up everything I needed.

12    I need to go get something.  I'll be right back.

13    [NOTE: The Court briefly leaves the courtroom and returns.]

14    THE COURT: I'm not sure just where we were in the sentencing

15    statement at the time that I continued this matter to get the witness here,

16    so we'll start all over again.

17    Mr. Phillips, if you and Mr. Sampson would come forward,

18    please.

19    [NOTE: Counsel and defendant approach the lectern.]

20    THE COURT:  Mr. Elijah Sampson, you appeared before the

21    Court on June 6, 2012, accompanied by your attorney, Mr. Robert Phillips,

22    III, for a Rule 11 proceeding.

23    On that date, pursuant to a plea agreement with the

24    government, you pled guilty and you were adjudged guilty of Count 17 of an

25    indictment charging you with carrying a firearm during and in relation to a

-4-

1   drug-trafficking crime, in violation of 18 United States Code, Section

2   924(c); and Count 18 of the indictment charging you with possession of a

3   firearm by a convicted felon, in violation of 18 United States Code, Section

4   922(g)(1).

5         Upon completion of the Rule 11 proceeding and the Court's

6   acceptance of the guilty plea, the Court directed the United States

7   Probation office to conduct a presentence investigation, and to file a report,

8   and to furnish you and your counsel and counsel for the government with a

9   copy of that report.

10         I ask you at this time, Mr. Sampson, have you had an

11   opportunity to read and discuss the presentence report and the addendum

12   to the report with your lawyer?

13         MR. SAMPSON: Yes, sir.

14         THE COURT: And do you or Mr. Phillips now have any

15   objections as to either the factual accuracy of the report, or to the probation

16   officer's application of the sentencing guidelines.  And let me state before

17   you begin, Mr. Phillips, I have read the objections to Paragraphs 26, 47 and

18   62 of the presentence investigation report; and I have also read the

19   probation officer's response to those objections.  I have read the

20   defendant's sentencing memorandum that you filed on behalf of the

21   defendant, Mr. Phillips; and I've read the government's sentencing

22   memorandum that the government filed in this case.

23         So you do not need to further articulate those objections for the

24   purpose of this hearing today, Mr. Phillips, but if you wish to speak any

25   further regarding any of those matters, then you're free to do so at this

-5-

1   time.

2             MR. PHILLIPS: No, sir, we stand on those objections, and the

3   only issue was to address the sentencing manipulation.

4             THE COURT: All right, sir.  Do you agree with that, Mr.

5   Sampson?

6             MR. SAMPSON: Yes, sir.

7             THE COURT:  There being no objections to the factual

8   statements contained in the presentence investigation report, the Court

9   adopts those statements as its findings of fact.

10            A question of guideline application has arisen with respect to

11  the conclusions contained in Paragraphs 26, 47 and 62 regarding the career

12  offender classification. The defense counsel questions that on the theory of

13  sentencing manipulation in this case.

14            So before I proceed further to make any findings in that regard,

15  Mr. Phillips, I'm prepared to hear whatever you wish to present regarding

16  that objections.

17            MR. PHILLIPS: May Mr. Sampson have a seat, Judge –

18            THE COURT: Yes, sir.

19            MR. PHILLIPS:  – and I'd like to call Special Agent Moore.

20            [NOTE: Defendant is seated.  Witness Sworn.]

21            CLERK: Please state your name and occupation, and spell your

22  last name for the record.

23            MR. MOORE: My name is Brian A. Moore, Special Agent with

24  the Bureau of Alcohol, Tobacco, Firearms and Explosives.  Last name is

25  spelled M-O-O-R-E.

-6-

1        MR. PHILLIPS: May I proceed, Your Honor?  May I proceed?

2        THE COURT: Yes, sir.

3                        B R I A N   A .   M O O R E

4        DEFENDANT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

5                        DIRECT EXAMINATION BY

6    MR. PHILLIPS:

7    Q    Agent Moore, I'm Bobby Phillips.  I represent Mr. Sampson and I have

8    a few questions for you, if you don't mind.

9    A    Yes, sir.

10   Q    Directing your attention to June 2011, you were undercover ATF at a

11   storefront in Thunderbolt; is that correct?

12   A    Yes, sir, that's correct.

13   Q    How did you learn about the defendant, Elijah Sampson, in this case?

14   A    It was brought to our attention by a confidential informant.

15   Q    And was that in June of 2011?

16   A    Somewhere around that time, yes, sir.

17   Q    Do you have your report with you so you can verify the dates?

18   A    Well, that was the first date of the deal, June 22nd.

19   Q    That was the first time that he came to your location in Thunderbolt?

20   A    Yes, sir, that's correct.

21   Q    And do you know how he happened to come to that location?

22   A    He drove, sir.

23   Q    Well, was he sent there by the confidential informant?

24   A    He was –

25   Q    – He was directed there?

-7-

1    A    He was by himself, so I don't know.

2    Q    My question is, how did he know to come to that specific location?

3         MS. IPPOLITO: I object.  He's answered as well as he can.  He

4    wouldn't know why this defendant –

5         THE COURT:  – Well, he can say whether he knows or whether

6    he doesn't know.  Ask the question, Mr. Phillips.

7    Q    Do you know how he came to – you said he dealt with this confidential

8    informant.

9    A    Yes, sir.

10   Q    How did he get from the informant to the location in Thunderbolt?

11   How did he know to come to Thunderbolt for a drug transaction?

12   A    That I'm not sure of, sir.  I'm assuming that he spoke with the CI about

13   it.

14   Q    So before he came on June 22, 2011, you had not had any contact with

15   Mr. Sampson?

16   A    No, sir, I haven't.

17   Q    Now, all of the transactions in Thunderbolt were videotaped; is that

18   correct?

19   A    Yes, sir, that's correct.

20   Q    You had like 12 – or maybe 20 cameras?

21   A    Cameras?

22   Q    A number of cameras.

23   A    I would say it's less than 20, sir.  I don't recall the exact number.

24   Q    But each and every one of them were videotaped?

25   A    Yes, sir, that's correct.

-8-

1    Q    Was the confidential informant supposed to have been at the location

2    the first time?  If you know.

3    A    My recollection is that he was supposed to be there, that's correct.

4    Q    Will you tell the Court, what was the nature of the transaction on June

5    22nd; that is, the quantity of drugs and the purchase price.  Do you have that

6    information?

7    A    It was arranged to purchase a half-ounce of powder cocaine for $600.

8    Q    And that transaction took place?

9    A    Yes, sir, that's correct.

10   Q    And there was no conversation at that point about any guns; is that

11   correct?

12   A    No, sir.

13   Q    Now, there was nothing at that point to stop you from arresting the

14   defendant on June 22, 2011.

15   A    Stop me?

16   Q    Yes, sir.

17   A    No, sir.

18   Q    Were you aware of his criminal history on June 22, 2011?

19   A    No, sir, I was not.

20   Q    Did you ever become aware of his criminal history?

21   A    Yes, sir, later on in the investigation.

22   Q    About how much later on?

23   A    He was identified on or about the end of September 2011.

24   Q    The next time that you saw the defendant was July 19, 2011; is that

25   correct?

-9-

1    A    Yes, sir, that's correct.

2    Q    Was that also in Thunderbolt?

3    A    Yes, sir, it was.

4    Q    In fact all of the meetings were in thunderbolt at the store front?

5    A    Yes, sir, that's correct –

6    Q    – On Rowan Avenue, all right.  What was the nature of the transaction

7    on July 19, 2011?  The quantity and the purchase price.

8    A    Purchase a half-ounce of powder cocaine for $600.

9    Q    Were guns discussed then?

10   A    No, sir.

11   Q    Why did you not arrest the defendant after that second transaction?

12   A    Because the investigation was a long-term undercover investigation, it

13   would not behoove us to arrest someone right after doing the second deal.

14   Q    The next time you saw the defendant was in August, August 24, 2011?

15   A    Yes, sir, that's correct.

16   Q    Was that transaction set up through the confidential informant, or was

17   it set up directly with you?

18   A    I believe it was a combination between the previous purchases and the

19   confidential informant.

20   Q    And this transaction on August 24th resulted in your purchasing about

21   14 MDMA tablets?

22   A    They came back negative for MDMA –

23   Q    – That's correct –

24   A    – but that was what they purported to be when they were sold.

25   Q    But they turned out to be counterfeit in reality.

-10-

1   A   Yes, sir, that's correct.

2   Q   And you paid $160?

3   A   Yes, sir, that's correct.

4   Q   Now, was any conversation about a gun during that transaction?

5   A   No, sir.

6   Q   When is the next time you saw the defendant after August 24th?

7   A   August 25th.

8   Q   And what was the nature of that transaction?

9   A   To purchase a half-ounce of powder cocaine.

10  Q   Now, from June 22nd through August 25th, had you or anyone else in

11  law enforcement to your knowledge been conducting any surveillance on

12  the defendant?

13  A   No, sir, not that I know of.

14  Q   What other investigation were you doing during that period of time on

15  the defendant as to these drug transactions?

16  A   I don't understand the question.

17  Q   Well, you said it was an ongoing drug investigation.

18  A   Yes, sir.

19  Q   What other ongoing activities were you engaged in with regard to this

20  defendant between June and August of 2011?

21  A   During that time frame we were basically just trying to identify him.

22  We had been given the name Sean, and each vehicle that he'd shown up

23  with, the tags would not come back to his name, so –

24  Q   – So it was only in September that you learned he was Elijah Sampson?

25  A   Yes, sir, that's correct.

-11-

1    Q    And you learned then of his prior criminal history?

2    A    Yes, sir, it was ran at that time, yes, sir.

3    Q    Now, there was a gun – when was the first gun transaction conducted?

4    A    The first gun transaction was conducted August 31st by Special Agent

5    Bignase.

6    Q    On August 25th there was a discussion about buying guns; was there

7    not?  Or do you recall.

8    A    I don't recall that, sir.

9    Q    And on August 31st, the gun transaction involved another individual;

10    didn't it?

11    A    Yes, sir, that's my understanding.  I was not there at the time of the

12    transaction.

13    Q    But your understanding from your report is that Mr. Sampson arrived

14    there on August 31st with another person who had a gun?

15    A    Yes, sir, that's correct.

16    Q    And Mr. Sampson sold drugs, but no gun?

17    A    At that time, yes, sir.

18    Q    Now, were you in charge of this investigation with regard to Mr.

19    Sampson?

20    A    No, sir, I wasn't.

21    Q    Who was in charge of the investigation?

22    A    Agent Valoze is the case agent for the whole investigation.

23    Q    Why did you not arrest the defendant on August 31st?

24    A    Again, it's a long-term undercover operation.

25    Q    When was your next transaction with the defendant?

-12-

1   A   September 22nd, sir.

2   Q   And that's 2011?

3   A   Yes, sir, that's correct.

4   Q   And what was the nature of that transaction?

5   A   Purchased one ounce of powder cocaine.

6   Q   And for that you paid eleven-hundred twenty-five dollars?

7   A   Yes, sir, that's correct.

8   Q   Now –

9   A   – Well, I misspoke.  I paid $1,000 at that time, owing him $125.

10   Q   The original purchase price was eleven twenty-five, but you didn't have

11   –

12   A   – That was what was quoted, yes, sir.

13   Q   Now, as of September 22nd, the date of that transaction, you had

14   information about who the defendant was; did you not?

15   A   No, sir, at that time, that's when found out who he was.

16   Q   On September 22nd?

17   A   On or about that date, yes, sir.

18   Q   Now, there still was no ongoing surveillance of him; is that correct?

19   A   No, sir, that's correct.

20   Q   Now, the next transaction was in October, October 26th of 2011?

21   A   September 28th I believe is the next transaction.  Again, I was not there.

22   I believe that was Agent Bignase and –

23   Q   – and what happened on September 28th?

24   A   Agent Bignase purchased approximately 15.2 grams of powder cocaine

25   for $600.

1    Q    How much?  I'm sorry.

2    A    Approximately 15.2, according to the report.

3    Q    For 2,000, did you say?

4    A    I'm sorry, 2,000.

5    Q    Thank you.

6    A    I didn't understand your last question.

7    Q    That's all right.  I was just asking the amount, the $2,000.

8    A    No, no, it was 15.2 grams for $600.

9    Q    $600.  What was the next transaction after the September 28th

10   transaction?

11   A    That would have been October 26, 2011.

12   Q    And that was for 15.3 grams of cocaine for $600?

13   A    Yes, sir, that's correct, as well as a handgun.

14   Q    Did you purchase a handgun on October 26th?

15   A    Yes, sir, I did.

16   Q    And that was a Cobra .380?

17   A    Yes, sir, that's correct.

18   Q    And you paid $450 for it?

19   A    Yes, sir, that is correct.

20   Q    Now, at that time you knew who the defendant was.

21   A    Yes, sir, that's correct.

22   Q    And you'd made numerous drug purchases from him.

23   A    I wouldn't say numerous, but there was previous drug transactions –

24   Q    – The ones that you've outlined here this afternoon.

25   A    I'm sorry?

-14-

1    Q    The ones that you've outlined here this afternoon.

2    A    Yes, sir, that's correct.

3    Q    Why did you not arrest him on October 26th?

4    A    Again, it was a long-term undercover investigation.

5    Q    Well, what were you doing in regards to that long-term undercover

6    investigation?

7    A    We were still purchasing illegal narcotics and firearms from other

8    defendants.

9    Q    Were they related to this defendant?

10   A    That I don't know, sir.

11   Q    When did you see the defendant again after October 26, 2011?

12   A    The next transaction would have been November 10, 2011.

13   Q    And that was for the purchase of a .38 Taurus revolver for $450 and a

14   pack of Cigarillos?

15   A    Yes, sir, that's correct.

16   Q    Going back to October 26th, do you remember telling – prior to October

17   26th telling the defendant that you wanted to buy handguns to ship to New

18   York?

19   A    I'm not familiar with what date, but we did discuss purchasing

20   firearms.

21   Q    And you – the agents, you and the other agents, brought that up to the

22   defendant; did you not?

23   A    Yes, sir, that's correct.

24   Q    Okay, and when you initially broached that subject, defendant told you

25   he did not have any handguns or guns to get you; is that not true?

-15-

1    A    I don't recall that, sir.

2    Q    So during the November 16th visit you also negotiated for the purchase

3    of some additional weapons from the defendant?

4    A    What was the date on that, sir?

5    Q    November 16th.

6    A    November 16th to purchase the Smith & Wesson .38 special.  Yes, sir, I

7    did tell him that we were looking for more guns to purchase.

8    Q    So as of November the 16th you had purchased one gun in October, the

9    gun on November 10, and then also the gun on November 16th; is that

10   right?

11   A    Yes, sir, that's correct.

12   Q    So the next time you saw the defendant was December the 19th?

13   A    Yes, sir, that's correct.

14   Q    And what was the nature of that transaction?

15   A    I purchased a half-ounce of powder cocaine and a Taurus .25 caliber

16   semi-automatic handgun.

17   Q    And you paid $500 for the cocaine and $400 for the weapon?

18   A    Yes, sir.

19   Q    Now, on December the 19th of 2011, do you remember that date and

20   that meeting with the defendant?

21   A    I recall it from my report, yes, sir.

22   Q    You remember a pink handle on the gun?

23   A    Yes, sir, I do.

24   Q    And defendant made some comments about the gun would still kill

25   people.  Why did you not arrest the defendant on that occasion?

-16-

1    A    Because, again, it was long-term undercover investigation.

2    Q    But you already had three or four gun sales and a number of drug

3    sales; right?

4    A    Yes, sir.

5    Q    Now, at any point up until December the 19th as part of your

6    investigation did you ever put the defendant under surveillance?

7    A    No, sir, we did not.

8    Q    The next time you saw the defendant was in January of 2012?

9    A    I apologize, I don't have that report in front of me, sir.

10             MR. PHILLIPS: Judge, may I approach? Approach and hand it

11   to him.

12             THE COURT: Yes, sir.

13   Q    Does that refresh your recollection, Agent Moore?

14   A    Yes, sir, that's correct.

15   Q    And so you saw him on January 25th of 2012?

16   A    Yes, sir, that's ...

17   Q    And during that visit you asked the defendant about selling an AK-47?

18   A    I believe Sampson asked me – or the defendant asked me –

19   Q    – Asked you about it.  And so you actually talked about buying that

20   weapon from him on January 25th?

21   A    Yes, sir, that's correct.

22   Q    And the next – but you didn't buy it on that date; is that correct?

23   A    No, sir.

24   Q    Did you ever buy an AK-47 from him?

25   A    No, sir.

-17-

1    Q    The next time you saw the defendant was on February 22nd; is that

2    correct?

3    A    Yes, sir, that's correct.

4    Q    And that's the date he was arrested.

5    A    Yes, sir, that's correct.

6    Q    And he had 13 grams of cocaine on his person?

7    A    Yes, sir.

8    Q    Who made the determination to arrest him on February 22, 2012?

9    A    The case agent, along with the prosecution made the date of the take-

10   down or the arrest for all the defendants.

11   Q    Did – all of the defendants?  You say all of the defendants as a part of

12   this undercover operation?

13   A    Yes, sir.

14   Q    Did you close down the Thunderbolt storefront then?

15   A    Yes, sir, we did.

16   Q    Did you ever try to get a name of a drug supplier from Mr. Sampson?

17   A    No, sir, we did not.

18   Q    Did you ever get him to tell you where he got the guns from?

19   A    No, sir, we did not.

20   Q    And why not?

21   A    After the arrest Mr. Sampson had fought with police.  He had resisted

22   arrest, had been tased twice in an attempt to escape, and after that we did

23   not want to speak with him.

24   Q    You had no evidence of Mr. Sampson ever selling guns to anyone else

25   before the transactions with you; do you?

-18-

1    A    The criminal history showed a possession of firearms.

2    Q    But no evidence of sales of firearms?

3    A    Not that I know of, no, sir.

4    Q    At any time during –

5              THE COURT:  – Wait a minute, it said possession of firearms.

6    Criminal history shows that when Mr. Sampson was 20 years old that he

7    was arrested in an automobile, and one handgun was found in the backseat

8    in the area where Mr. Sampson was seated.  The statement was that he had

9    a criminal history of possessing firearms, and I'm not sure that the answer

10   conforms with the criminal history in the PSI.

11             MR. PHILLIPS: I don't recall that off the top of my head, Judge.

12   I'd have to look at it again.  But I was directing my question toward the sale

13   of firearms.  I thought the PSI did mention –

14             THE COURT:  – You asked a question, you said, you don't have

15   any evidence of him selling firearms before, and his answer was he has a

16   criminal history of possession of firearms.

17             MR. PHILLIPS: Yeah, okay.  I don't know if that's in his history

18   or not, Judge, I'd have to look at it.

19             THE COURT: But he has a criminal history of having been

20   arrested one time in a car where there was a single weapon found, a

21   handgun, in the backseat in the area where the defendant was seated, okay?

22             MR. PHILLIPS: Yes, sir, I understand.

23             THE COURT: Let's make sure the record knows that.

24             MR. PHILLIPS: All right, yes, sir.

25   Q    (By Mr. Phillips) At any time prior to the arrest, did you personally

-19-

1    discuss the timing of the arrest with any Assistant District Attorney in

2    Chatham County?  The Chatham County DA's office?

3    A    No, sir.

4    Q    Did you ever have that discussion with any person in the U.S.

5    Attorney's office as to the timing of the arrest?

6    A    I believe Agent Valoze did.

7    Q    Now, you could have arrested him at any time during those numerous

8    transactions because he committed a crime?

9    A    Yes, sir.

10   Q    And the reason – you're saying the reason you did not do that because

11   it was an ongoing investigation?

12   A    That's correct.

13   Q    But you admit to this Court that you're the one who brought up the

14   possibility of buying drugs – buying weapons from Mr. Sampson?

15   A    Yes, sir.

16            MR. PHILLIPS: No further questions, Judge.

17            THE COURT: Any questions, Ms. Ippolito?

18            MS. IPPOLITO: Yes, Your Honor.

19                      CROSS-EXAMINATION BY

20   MS. IPPOLITO:

21   Q    Agent Moore, do you know of any other information besides the

22   conviction for a concealed weapon, any other information in the hands of

23   the ATF regarding this defendant's previous involvement in guns?

24   A    No, sir –

25   Q    – You're not aware –

-20-

1    A    – No, ma'am, not that I recall.  No, ma'am.

2    Q    Okay.  Why would the ATF – why is ATF interested in buying firearms

3    from people like Mr. Sampson?

4    A    That's ATF's goal, is to reduce violent crime and to get firearms and

5    illegal narcotics off the streets.

6    Q    Why would you buy more than one gun?

7    A    Well, I think it shows a pattern for the defendant, as well as, you know,

8    it's part of our job.  We're supposed to get as many guns off the street as we

9    possibly can.  Illegal guns.

10   Q    Would you have any way of knowing – you mentioned earlier that you

11   investigated multiple defendants in the same storefront operation.  Would

12   you have any way of knowing for sure whether or not they were associated

13   with one another while you were carrying on the investigation?

14   A    No, ma'am.

15   Q    During these meetings with the defendant – defense counsel asked

16   about the time the defendant offered to sell you an AK-47.  Were there also

17   other times when he offered additional weapons?

18   A    Yes, ma'am, there were.

19   Q    So in addition to the five guns that he actually sold you, how many

20   times did he offer additional guns?

21   A    I believe it was five other times.

22   Q    Why would you not arrest this guy every time his lawyer asked you,

23   why didn't you arrest him then?  Why didn't you arrest him then?  Why

24   didn't you?

25   A    It would have blown the whole undercover operation.  Our location

-21-

1   would have been – the street lingo is burned.  Everyone would know that

2   we were the police, and it would not get us to our goal of trying to get as

3   many illegal guns off the street.

4   Q    This operation was established by a joint task force between ATF and

5   the Savannah-Chatham Metro Police; is that right?

6   A    Yes, ma'am, that's correct.

7   Q    How long was the storefront in operation?

8   A    A little over a year, ma'am.  I believe.

9   Q    Did it – was it in a commercial location where you were paying rent?

10  A    Yes, ma'am, it was.

11  Q    And were there operating overhead costs to the location such as

12  utilities, cable, things like that?

13  A    Yes, ma'am, there were.

14  Q    All those things were set up by the agencies in anticipation of running a

15  long-term investigation?

16  A    Yes, ma'am, that's correct.

17  Q    And why – what is the purpose of doing this sort of thing here in

18  Chatham County?

19  A    Well, first of all, it reduces violent crime.  Word gets out that people are

20  being arrested by the federal agencies for gun crimes, and lot of times the

21  ones that are still in the street will think twice about selling guns or

22  possessing guns when they're not supposed to.

23  Q    And did this location also have multiple cameras set up for audio and

24  video recording of the contacts with suspects?

25  A    Yes, ma'am, it did.

-22-

1    Q    And was that system designed by technicians in order to best capture

2    the evidence at the highest quality?

3    A    Yes, ma'am.

4    Q    And while you were having contact with people on camera, did you put

5    forth an undercover story about wanting to buy guns?

6    A    Yes, ma'am, we did.

7    Q    What was the reason that you-all did that?

8    A    Well, the story was always that we were sending the guns up to New

9    York.  It's unusual for one person to buy multiple guns over and over, so we

10   give them the story that these guns are being shipped to New York, and

11   we're doubling our money then because the prices of guns in New York are

12   traditionally higher than they are here in the state of Georgia.

13   Q    Now, you bought contraband in this location from a number of

14   different defendants; right?

15   A    Yes, ma'am, we did.

16   Q    Once you bought a firearm – one firearm from each person, would you

17   then arrest that person?

18   A    No, ma'am.

19   Q    Why not?

20   A    Again, it's an ongoing long-term investigation.  If we arrested everyone

21   after the first hand-to-hand or purchase, then it would blow our operation.

22   Q    Once you came into contact with the defendant here, did you attempt

23   to learn his true identity?

24   A    Yes, ma'am, we did.

25   Q    What sorts of steps did you take to learn his true identity?

-23-

1   A    It was running the vehicles' tags that he was showing up in, and

2   running the names off the vehicle tags to try to identify the name off of that.

3   A lot of times the vehicles were coming back to females.

4   Q    If you had arrested him after your first purchase of cocaine from him

5   like his lawyer says you should have, would you have been able to put his

6   name on a warrant?

7   A    No, ma'am.

8   Q    Would you have been able –

9   A    – Other than a –

10  Q    – to charge him?

11  A    Only name we had was the name that he had given us, which would

12  have been Sean, which is actually not his real name.

13  Q    So if you took out a warrant for someone named Sean, would there

14  ever be any way to serve that warrant?

15  A    No, ma'am, there wouldn't.

16  Q    And you mentioned that you did not learn his true identity until some

17  time in September?

18  A    Yes, ma'am, I believe it was September time frame, end of September.

19  Q    Okay, so by that time you had met with him one, two, three, four, five,

20  six times; right?

21  A    Well, myself and other agents in combination.

22  Q    Agents had met with him six times.

23  A    Right.

24  Q    Is that accurate?

25  A    Yes, ma'am.

-24-

Q    Okay, and one firearm had already been purchased from him by that time?

A    Yes, ma'am, that's correct.

Q    And it was sold in connection with another person; is that right?

A    Yes, ma'am.  If I could clarify my answer on the previous question.  He had brought in a second subject who identified himself as Red who sold the .22 to undercover Agent Bignase.

Q    And on December 19th you conducted the transaction that you were asked about earlier where he sold you cocaine and the Taurus .25 pistol with the pink handles; is that right?

A    Yes, ma'am, that's correct.

Q    Have you reviewed that video in order to present it to the Court this afternoon?

A    Yes, ma'am, I have.

Q    Approximately how long is that video?

A    I'd probably say 10 or 15 minutes or less.

MS. IPPOLITO: Your Honor, at this time I would ask the Court for leave to play the video so that the Court can observe the transaction this defendant pleaded guilty to.

THE COURT: All right.  I believe you played it at the Rule 11, as I recall, but I'm happy to look at it again.

MS. IPPOLITO: Thank you, Your Honor.

[NOTE: A video is played.]

Q    (By Ms. Ippolito) Agent Moore, are there any other facts connected to the December 19th transaction or other contact with the defendant that you

1    would like to add?

2    A    No, ma'am.

3              MS. IPPOLITO: Thank you, Your Honor.

4              MR. PHILLIPS: No further questions, Judge.

5              THE COURT: All right, you may come down, sir.  Thank you.

6         [Witness Excused]

7              THE COURT: Any other witnesses that you wish to call, Mr.

8    Phillips?

9              MR. PHILLIPS: No, sir.

10             THE COURT: Does that conclude the objections regarding the

11   issue of sentencing manipulation as far as any evidence that you wish to

12   present –

13             MR. PHILLIPS: Yes, it does.

14             THE COURT:  – regarding that argument?

15             MR. PHILLIPS: Yes, sir.

16             THE COURT: All right, sir.  You can have a seat, Mr. Phillips.

17             After considering the objections raised in this case, and after

18   hearing the testimony of Agent Moore, and viewing the video, and

19   considering the arguments made in the sentencing memorandum filed by

20   the defendant, and also the sentencing memorandum filed by the

21   government, it's the findings of the Court that on June 6, 2012, the

22   defendant pled guilty to one count each of carrying a firearm during and in

23   relation to a drug-trafficking crime, and possession of a firearm by a

24   convicted felon.

25             According to the presentence investigation report, the

-26-

1  defendant sold cocaine to an undercover agent three times from June 22,

2  2011 to August 25, 2011; and on one occasion the defendant sold what he

3  purported to be ecstasy to an undercover agent; however, testing revealed

4  that the tablets did not contain any controlled substance.

5  During the August 25, 2011 sale, the agent inquired about

6  purchasing from the defendant handguns for shipment to New York.  On

7  August 31, 2011, the defendant sold a rifle to the agent, promising to bring a

8  handgun to sell at a later date.

9  Defendant then sold cocaine to the agent on two occasions,

10  September 22 and 28, 2011.  Between October 26, 2011 and December 19,

11  2011, defendant sold handguns to the agent on four separate occasions.

12  The Eleventh Circuit does not recognize sentencing entrapment

13  as a viable defense, citing *Ciszkowski*, if that's the right pronunciation –

14  *United States v. Ciszkowski*, and that's an Eleventh Circuit opinion in

15  2007.  Based upon the Eleventh Circuit's continued and unequivocal

16  statements that it does not recognize sentencing entrapment, then that

17  issue requires no further discussion.

18  However, the Eleventh Circuit does recognize sentencing

19  manipulation, citing *United States v. Sanchez*, a 1998 opinion, and this

20  defense focuses on the actions of law enforcement rather than on any

21  predisposition of the defendant to commit a particular crime.

22  To find sentencing manipulation, the government's conduct

23  must be so outrageous that it is fundamentally unfair, here citing *United*

24  *States v. Ofshe,* a 1987 Eleventh Circuit opinion.  In this context

25  government conduct is outrageous when law enforcement obtains a

-27-

1   conviction for conduct beyond a defendant's predisposition by employing

2   methods that fail to comport with due process guarantees.  Sentencing

3   factor manipulation occurs when the government's manipulation of a sting

4   operation, even if insufficient to support a due process claim, requires that

5   the manipulation be filtered out of the sentencing calculus, citing *Sanchez*.

6            Unfortunately for us here, that is the extent of the Eleventh

7   Circuit's development of any standard for sentencing manipulation.

8   However, the facts and *dicta* in *Ciszkowski* provide some useful insight.  In

9   that case, the defendant contracted with an undercover agent to kill an

10  informant for the Drug Enforcement Agency.  At a later meeting, the agent

11  provided the defendant with a brown paper sack containing cash and

12  ecstasy as payment for the murder, and a Ruger pistol to carry out the hit.

13  Unknown to the defendant, the barrel of the pistol included a silencer.

14  Ultimately the defendant was convicted of, among other crimes, possession

15  of a firearm with a silencer in furtherance of a crime of violence and drug-

16  trafficking crime.

17           In that case, at sentencing the district court declined to depart

18  from the mandatory minimum sentence of 30 years for possession of a

19  silenced handgun.  On appeal, the Eleventh Circuit rejected the defendant's

20  argument that the mandatory minimum should not apply due to the

21  government's actions with respect to supplying the firearm with the

22  undetected silencer.  As an initial matter, the Eleventh Circuit recognized

23  that the defendant bears the burden of establishing that the government's

24  conduct is sufficiently reprehensible to constitute sentencing factor

25  manipulation.  Also, the Eleventh Circuit noted that the fact that law

-28-

1   enforcement may provide drugs or guns essential to a willing and

2   predisposed offender does not necessarily constitute misconduct, citing

3   *Sanchez*.  Rather, the government's actions must rise to the level of

4   extraordinary misconduct.

5   　　　　　Ultimately, the Eleventh Circuit found that the government did

6   not engage in extraordinary misconduct, finding it conceivable that the

7   government could reasonably decide that a muzzled firearm is the

8   appropriate weapon for the commission of a murder for hire, and then

9   provide the defendant with such a weapon.  However, the Court noted it

10  would be troubled if the government provided the muzzled weapon solely

11  to influence the defendant's sentence upon a conviction.

12  　　　　　Furthermore, the Court stated that it might be inclined to find

13  sentencing manipulation if the government provided an undetectable

14  silenced weapon in a circumstance where the firearm or the silencer was

15  completely unrelated to the accompanying criminal act.

16  　　　　　Based upon the Eleventh Circuit's discussion in *Ciszkowski*,

17  this Court in this case does not believe that defendant in this case can

18  establish a claim of sentencing manipulation.  Absent some sort of

19  admission by the government that the purpose of expanding the sting from

20  drugs to firearms was for the sole purpose of increasing defendant's

21  sentence, the government's decision to escalate the sting – in this case the

22  firearms – is understandable because it is an independent crime that law

23  enforcement may choose to include in their sting.

24  　　　　　For an example, the Eleventh Circuit has declined to recognize

25  sentencing manipulation where the government's decisions subjected the

-29-

1    defendant to an increased sentence, such as using a minor victim in a sting

2    operation, selling the defendant crack instead of cocaine, or selecting a

3    larger fictitious amount of drugs for the defendant to steal.  In light of

4    *Ciszkowski*, sentencing manipulation only occurs where the government

5    surreptitiously causes a defendant to commit a crime completely unrelated

6    to the unrelated criminal act that the defendant has elected to commit.

7           The only argument that this Court can see for sentencing

8    manipulation in this case is that the government fundamentally changed

9    the nature of the sting operation from drugs to guns.  However, this

10   argument only works if the government can offer no reasonable

11   explanation as to why it elected to make that change.  Indeed, even this

12   admission might be insufficient to find sentencing manipulation because

13   *Ciszkowski* appears to also require that the government act in some

14   surreptitious manner, such as including an undetectable silencer on a

15   firearm, and in this case there's no evidence in the record that any action by

16   the government caused defendant to unwittingly commit the firearm crime.

17          As mentioned, absent an admission by the government that the

18   purpose of the firearm sale was to subject defendant to a greater sentence,

19   there is no ground to find sentencing manipulation.  Indeed, it would be

20   odd to think that the government is precluded from expanding the scope of

21   any sting operation to encompass additional crimes, instead being forced to

22   limit the sting operation to its original purpose.

23          Given the deference that the Eleventh Circuit often shows to

24   law enforcement, the Eleventh Circuit is likely to reverse any finding of

25   sentencing manipulation absent an outright admission by the government

-30-

1    that the government engaged in such manipulation, and that does not

2    appear to be the record in this case.

3              After considering the objections raised in this case, and all of

4    the other matters that the Court has stated that it has considered, and for

5    the reasons just stated, the Court concurs with the findings in the

6    presentence investigation report, including the addendum, and determines

7    that the applicable advisory guidelines are: a total offense level of 30;

8    criminal history category 4; 262-to-327 months of imprisonment; two-to-

9    five years of supervised release as to Count 17; one-to-three years of

10   supervised release as to Count 18; a $15,000 to $150,000 fine; no

11   restitution; and a $200 special assessment.

12             Now, Mr. Phillips, does defense counsel wish to make any

13   statement or present any information in mitigation of sentence?

14             MR. PHILLIPS: No, sir.  You want us to ...

15             THE COURT: Yes, sir.

16             [NOTE: Counsel and defendant approach the lectern.]

17             THE COURT: Do you have anything outside of the sentencing

18   memorandum you filed, Mr. Phillips?

19             MR. PHILLIPS: No, sir.

20             THE COURT: Does the government wish to present any

21   information as to the appropriate sentence?

22             MS. IPPOLITO: Your Honor, we rely on our sentencing

23   memorandum; in particular, our reliance on *United States v. Denson* and

24   we note that under 3553(a), a guideline sentence is appropriate in this case.

25   We urge the Court that there is no reason to depart or vary from the

-31-

1    guidelines here, and that to do so would lead to an unwarranted sentencing

2    disparity between this defendant and other career offenders, especially in

3    light of the fact that he has been to allowed to plea to one count of 924(c)

4    when, if he had gone to trial in this case, he would have a faced a 55-year

5    mandatory minimum for three counts of 924(c).

6            We respectfully urge the Court to sentence him within the

7    guideline range.

8            THE COURT: Mr. Sampson, the law provides that you have the

9    right to make any personal statement to the Court before the imposition of

10   sentence.  Do you now wish to make any statement or is there any

11   additional information that you would like the Court to consider in

12   mitigation of sentence?

13           MR. SAMPSON: No, sir.

14           THE COURT:   I have listened to the defendant's counsel, the

15   defendant having elected not to make a statement. I've listened to counsel

16   for the government.  I've reviewed the presentence investigation report and

17   the addendum to the report.  I've heard the testimony today of Agent

18   Moore, and I've seen and heard the video presentation; and I've also

19   considered the memorandums filed by both the defense and by the

20   government in this case.  I've also considered the factors set forth in 18

21   United States Code, Section 3553(a).

22           Pursuant to the Sentencing Reform Act of 1984, it is the

23   JUDGMENT OF THE COURT that the defendant, Elijah Sampson, is

24   hereby committed to the custody of the Bureau of Prisons to be imprisoned

25   for a term of 180 months.

-32-

1               This Court does not agree that the appropriate sentence in this

2  case should have a sentencing range between 262 months to 327 months of

3  imprisonment.

4               The defendant in this case is now 23 years of age.  The

5  defendant left school in the sixth grade because of below-test average

6  scores, and was not able to keep up.  The defendant was raised principally

7  by his mother, his mother and father having never married, and having

8  little or no contact with his father.  Indeed, during an eight-year period of

9  time during the defendant's early age, the defendant's father spent that

10  time in prison.  Since he was sixteen years of age the defendant has used

11  marijuana on a daily basis.

12               The defendant is a career criminal in this case because of what

13  has to be considered as minor drug infractions; not that they're not drug

14  related, but in 2009 when the defendant was 20 years of age, he was

15  arrested in Chatham County, Georgia by state authorities and he was

16  sentenced and pled to possession with intent to distribute marijuana.  In

17  that case, the defendant possessed five small bags of marijuana, $86 in

18  case, and there was no weapon involved.  Several months later, again when

19  the defendant was 20 years of age, the defendant pled guilty to the same

20  offense, possession with intent to distribute marijuana.  On that arrest, the

21  defendant had what – according to the PSI, in his possession a small

22  quantity of marijuana, and $282 in cash.  And again, there was no weapon

23  involved.

24               When the defendant was 20 years of age he was a passenger in

25  an automobile.  There was a stop of the automobile.  The defendant was not

1    the driver of the automobile.  A firearm was found in the backseat area of

2    that automobile where the defendant was seated, and the defendant was

3    sentenced for being in possession of a firearm.  There was no charge of

4    being a felon in possession of a firearm, but he did receive a firearm

5    possession sentence in that case.

6         The defendant has no juvenile record, according to the

7    presentence investigation report.  So he has had, when he was 20 years of

8    age, two possessions with intent to distribute marijuana involving very

9    small amounts of marijuana.  The defendant has no history – even though

10   prior to this case he had the one history of a firearm, the defendant has no

11   history of any type of violent behavior.  He has no history of robberies,

12   assaults, burglaries, or any weapons, other than in this case where he sold

13   weapons and drugs to the undercover agent, of being involved in any of his

14   prior activities.

15        A sentence anywhere within the range of 262-to-327 months, in

16   this Court's opinion, is not warranted in this case.  It vastly overstates and

17   over-represents the true criminal history of this defendant in this Court's

18   opinion.  The Eleventh Circuit has held that the district court may

19   determine on a case-by-case basis the weight to give guidelines, so long as

20   that determination is made with reference to the remaining Section 3553(a)

21   factors that the Court must consider in calculating the defendant's

22   sentence.  Factors to be calculated in imposing a sentence require that the

23   Court should impose a sentence sufficient but not greater – and I

24   emphasize but not greater – than necessary to comply with the purposes

25   set forth by the Sentencing Commission and the Congress in the 18,

-34-

1    3553(a) factors.  And in making the determination as to what the sentence

2    should be, the Court should consider, first, the nature and circumstances of

3    the offense, and the history and characteristics of the defendant.  The Court

4    has just outlined the history and some of the defendant's characteristics.  I

5    did leave out the fact that this defendant was living at home being

6    supported by his single parent, his mother, was helping his mother at the

7    time of this offense attend to a sibling - that being one of his brothers –

8    who is a quadriplegic.

9            In imposing this sentence, the Court is required to reflect on

10   seriousness of the offense, to promote respect for the law, and to provide

11   just punishment for the offense.  And I have done that.  This is a drug

12   offense, which is a serious offense.  But because of two offenses when the

13   defendant was 20 years of age involving a very small quantity of marijuana,

14   a very small amount of cash, no weapons or violence involved, then he's

15   now looking at guidelines of 262-to-327 months.  In the Court's opinion, in

16   order to promote respect for the law in this case, a sentence of 180 months,

17   which is 15 years, is more than sufficient to punish this defendant for the

18   conduct based upon these considerations, and it also provides just

19   punishment for this offense.  The defendant was not a ringleader in an

20   organization, he was not a manager of a drug organization.   There's been

21   no evidence that he controlled others, or that he supervised others.  He was

22   a 23-year-old street drug dealer, for lack of a better description.  He was

23   not a manager or organizer, or a facilitator.

24           In the Court's opinion, this sentence that the Court has

25   announced today affords adequate deterrence of future criminal conduct by

-35-

1    this defendant.  As I've said, this is a sentence of 15 years, 180 months.  The

2    defendant is not likely to be out on the street any time soon.  And he will

3    also be under supervised release at the end of this sentence.

4         In the Court's opinion this sentence protects the public from

5    further crimes of the defendant.  Having this 23-year-old man incarcerated

6    for 15 years, in the Court's opinion, adequately protects the public from any

7    future crimes by this defendant.

8         In the Court's opinion, this sentence also can and will provide

9    the defendant with needed educational or vocational training. As I've said,

10   this defendant has had no education since the sixth grade.  He apparently

11   has learning problems that kept him from keeping up in school.  He has not

12   received a GED or had any formal training since that time.  While in the

13   custody of the Bureau of Prisons the defendant would have an opportunity

14   to complete a general educational diploma.  He would have an opportunity

15   to develop job skills and vocational training.  He will obviously be entitled

16   to medical care and other correctional treatment.  And also, the defendant,

17   it seems to be unquestioned, since he was 16 years old has had daily use of

18   marijuana.  During this period of incarceration, the defendant will be

19   entitled to drug counseling and drug abuse programs while incarcerated,

20   which will hopefully during this long period of incarceration benefit the

21   defendant as far as giving him correctional treatment in the most efficient

22   manner for his drug problem.

23        In good conscience in this case for all the reasons stated, it is

24   this Court's opinion that a sentence of 180 months in this case is sufficient

25   and adequate to meet all the sentencing objectives of the Congress, of the

-36-

1      Sentencing Commission, and of law enforcement.

2              The Court's sentence in this case is a variance, and I have cited

3      the 3553(a) factors which I have considered in making this variance, and

4      also the fact that in the Court's opinion, based upon the history of this

5      defendant, his criminal history over-represents what should be considered

6      as his true criminal history.

7              The Court has granted a variance from the sentence called for

8      by application of the advisory guidelines, which range exceeds 24 months,

9      and the Court has given the reasons for doing so.  And even though the

10     defendant's conduct is serious conduct, the Court has determined that the

11     sentence of 180 months is sufficient to address all of the sentencing factors

12     set forth in 18 United States Code, Section 3553(a).

13             It is recommended that the defendant be evaluated by Bureau

14     of Prisons officials to establish his participation in an appropriate program

15     of substance abuse treatment and counseling during his term of

16     incarceration.

17             After considering the factors set forth in United States

18     Sentencing Guidelines, Section 5E1.2(d), the Court has determined that the

19     defendant does not have the ability to pay a fine.

20             FURTHER ORDERED that defendant shall pay to the United

21     States a special assessment of $100.00 as to each count, for a total of

22     $200.00, which shall be due immediately.

23             Upon release from imprisonment, the defendant shall be placed

24     on supervised release for a total term of five years.  This term of

25     supervision is comprised of a five-year term of supervised release as to

-37-

1    Count 17; and a concurrent three-year term as to Count 18.  While on

2    supervised release the defendant shall comply with the standard conditions

3    of supervision adopted by this Court; and the mandatory conditions

4    required by 18 United States Code, Section 3583, which will include, but

5    not be limited to, urine testing, a prohibition against possession of any

6    firearm or other dangerous weapon, and a prohibition against the violation

7    of any local, state or federal law.

8          Further, the defendant shall cooperate in the collection of a

9    DNA sample as directed by the probation officer pursuant to 18 United

10   States Code, Section 3583.

11         The defendant shall participate in a program of testing for drug

12   and alcohol abuse; and further, the defendant shall not tamper with any

13   testing procedure.

14         The defendant shall earn his General Educational Development

15   diploma if such diploma is not earned while incarcerated.

16         The defendant shall submit his person, property, house,

17   residence, office, papers, vehicles, computers, as defined in 18 United

18   States Code, Section 1030(e)(1), or other electronic communication or data

19   storage devices or media, to a search conducted by the United States

20   Probation officer at a reasonable time and in a reasonable manner based

21   upon reasonable suspicion of contraband or evidence of a violation of a

22   condition of release.  A failure to submit to such a search may be grounds

23   for revocation.  The defendant shall warn any other occupants that the

24   premises may be subject to searches pursuant to this condition.

25         The probation officer is hereby directed to provide the

-38-

1    defendant with a written statement which sets forth all the conditions to

2    which the term of supervised release is subject.

3              The Court has accepted the plea agreement because it is

4    satisfied that the agreement adequately reflects the seriousness of the

5    actual offense behavior, and that  accepting the plea agreement will not

6    undermine the statutory purposes of sentencing.

7              In accordance with the plea agreement, IT IS ORDERED that

8    Counts 1 through 16, and Count 19 of the indictment be dismissed.

9              It is FURTHER ORDERED that defendant is remanded to the

10   custody of the United States Marshal.

11             Mr. Phillips, whatever designated institution you want me to

12   recommend to the Bureau of Prisons, if you'll let the probation office know,

13   I will make that recommendation in the final judgment and commitment in

14   this case.

15             Mr. Sampson, you are now advised that it is your right to appeal

16   from this sentence within 14 days from this date; and a failure to appeal

17   within the 14-day period shall be a waiver of your right of appeal.  The

18   government may appeal this sentence.

19             You are also advised that you are entitled to assistance of

20   counsel  in taking an appeal, and if you're unable to afford a lawyer one will

21   be provided for you.

22             If you so request the Clerk of Court will prepare and file a notice

23   of appeal on your behalf.

24             Sentence has now been pronounced.  Other than any objections

25   previously stated for the record, do you now have any objections to the

-39-

1    Court's findings of fact, conclusions of law, or manner in which the

2    sentence was pronounced, Mr. Phillips?

3                MR. PHILLIPS: No, sir, we do not.

4                THE COURT: Ms. Ippolito?

5                MS. IPPOLITO: No, Your Honor.

6                THE COURT: Mr. Sampson, you received a sentence today that

7    is a lengthy sentence.  More than likely when you get through serving this

8    sentence you'll be somewhere around 36-37 years of age.  You've still got

9    the remainder of your adult life ahead of you.  I hope that this Court was

10   not wrong today.  I hope that there is something to be saved in you.  But I

11   can tell you this, if during this period of incarceration, if you don't further

12   your education, and if you don't learn some kind of job skill, and if you

13   don't rid yourself of your marijuana habit, when you get back out and get

14   back on the street, as we say, then more than likely you'll end up

15   committing another drug offense and going back to prison for the

16   remainder of your adult life.  Do you understand what I'm saying to you?

17               MR. SAMPSON: Yes, sir.

18               THE COURT: Well, you need to understand what I'm saying to

19   you.  And I'm sure Mr. Phillips will explain that to you.  Because you won't

20   get another chance if you go back to being a drug dealer on the streets.  And

21   you won't get another chance if you go back to being a felon who possesses

22   or sells firearms.

23               Now, you cannot have – for the rest of your life you cannot

24   possess a firearm of any kind.  Do you understand that?

25               MR. SAMPSON: Yes, sir.

-40-

1    THE COURT: Not just selling it.  You can't have it.  You can't

2    have it in the car you're driving in.  You can't have it where you work.  You

3    can't have it where you live.  It's no excuse to say, well, it wasn't mine, it

4    belonged to somebody else.  If you're arrested and found in possession of a

5    firearm again, then you will spend significantly more time in jail than

6    you're getting at this sentence today.  Do you understand that?

7    MR. SAMPSON: Yes, sir.

8    THE COURT: You're going to be under supervised release for

9    five years.  That means you're going to have to report regularly to these

10   people over here at the probation office.  You're going to have to get a job

11   and work and report your job.  You're going to have to live in a good

12   environment.  You're going to have to tell them where you're living.  You're

13   going to have to be a law-abiding citizen.  That's what's going to be required

14   of you.

15   Now, when you're in prison you can do two things: You can

16   either hang out with criminals – 'cause everybody is in there for something,

17   but a lot of them are in there for worse things.  Now you can either hang out

18   with, I don't know, lack of a better description, hang out with the home-

19   boys or whatever you say, and just become a worse person.  Or you can try

20   to improve yourself.  That's going to be up to you.  I hope you make the

21   right decision, Mr. Sampson.

22   All right, we'll be in recess.

23   [NOTE: Whereupon the proceedings are concluded.]

-41-

STATE OF GEORGIA

CHATHAM COUNTY.


CERTIFICATE OF REPORTER


I, Marie Cowart, do hereby certify that the above and foregoing pages of typewritten material is a true, correct and complete transcript of the evidence and proceedings adduced in the hearing stated in the captioned matter.

This 5th day of December, 2016.


/s/ *Marie Cowart*

Marie Cowart, CCR B-237
United States Court Reporter
Southern District of Georgia
Savannah Division


P. O. Box 9572
Savannah, GA 31412
(912) 650- 4066